IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY PULLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 5602 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Anthony Pulli ("Plaintiff") brings this action pursuant to the Social Security Act ("the

Act"), 42 U.S.C.A § 405(g), seeking judicial review of the final decision of the Commissioner of

the Social Security Administration ("SSA"), who determined that Plaintiff was not disabled

under the Act until April 1, 2007. (R. 1, Compl.) Plaintiff argues that the record establishes that

he was disabled as of December 2003. (R. 18, Pl.'s Mem. at 1.) Presently before the Court are

the parties' cross-motions for summary judgment. (R. 16, Pl.'s Mot. for Summ. J.; R. 22, Def.'s

Mot. for Summ. J.) For the reasons stated below, the Commissioner's motion is granted and

Plaintiff's motion is denied.

## RELEVANT FACTS[1]

Plaintiff was born on April 20, 1948, and is a resident of Chicago, Illinois. (A.R. 122,

160.) Plaintiff's childhood was tumultuous; after his parent's divorce, he was placed in foster

---

[1] Citations to (R. .) refer to the record number that a document is assigned on the docket
for this case. Citations to (A.R. .) refer to the administrative record of these proceedings, which
was filed as entry 12 on the docket.

1

care and estranged from his family. (A.R. 257.) Plaintiff never graduated high school, but was able to achieve his Graduate Equivalency Degree ("GED") while in the military. (A.R. 19, 257.) Plaintiff served in the military from 1968 to 1971, when he received an dishonorable discharge. (A.R. 19, 128.) Plaintiff's most recent employment history includes working a variety of positions at a meat plant and various truck driving jobs. (A.R. 20-21, 145-46.) Plaintiff claims that he quit working in 2001 to care for his ailing wife. (A.R. 21, 146.) His wife died in December 2003, and thereafter Plaintiff became homeless. (A.R. 21, 257.) On September 22, 2005, Plaintiff visited the Chicago Department of Human Services ("DHS") intake center and was assigned to case specialist Barbara Ireczek ("Ireczek"). (A.R. 411-50.) Ireczek assisted Plaintiff with a variety of social services including shelter placement, healthcare and counseling services. (*Id.*)

## I. Medical Evidence

Plaintiff alleges that he suffers from physical pain in his lower back, head, and his left hand due to a lost finger, and has problems with his left knee. (A.R. 154.) Plaintiff also claims to suffer from depression. (A.R. 210.) There is no medical evidence related to his alleged impairments between March 1, 2001,[2] and September 28, 2005. (A.R. 64.) Subsequent medical evidence of Plaintiff's physical and mental impairments is detailed below.

---

[2] March 1, 2001, is the date Plaintiff alleged in his application that his disability began. (*See* A.R. 62.) Plaintiff now argues that his disability began in December 2003. (R. 18, Pl.'s Mem. at 1.)

2

## A. Evidence of Physical Impairment

On September 28, 2005, Plaintiff received treatment for an upper respiratory infection through Heartland Health Outreach ("Heartland"). (*Id.*) A month later, on October 26, 2005, Plaintiff received emergency care at Louis A. Weiss Memorial Hospital ("Weiss Hospital") for face and nose injuries after he was reportedly punched in the face by a stranger. (A.R. 239-255.) Two days later, Plaintiff returned to the hospital complaining of double vision. (A.R. 67.) Plaintiff was diagnosed with a left eye contusion and was sent home after his CT scan came back negative. (*Id.*)

After Plaintiff applied for disability, on October 24, 2005, at the request of the Department of Disability Determinations ("DDD"), Plaintiff had a consultative examination with Dr. Kirit Joshi ("Dr. Joshi"). (A.R. 235-238.) During the examination, Plaintiff complained of lower back pain that radiated down his left thigh and leg. (A.R. 235.) Plaintiff indicated that he took Ibuprofen for the pain. (*Id.*) Dr. Joshi observed that Plaintiff walked "with normal gait without any support of cane or crutches." (*Id.*) Further, Dr. Joshi examined Plaintiff's hands and found that manipulation in both hands was normal. (A.R. 237.) Dr. Joshi concluded that Plaintiff suffered from chronic lower back pain with left leg radiculopathy that stems from a motorcycle accident years earlier, and has since become more severe. (A.R. 238.)

On November 23, 2005, at the request of the DDD, Dr. Oh B. Rock ("Dr. Rock"), reviewed Plaintiff's medical records and concluded that there were "no objective findings for severe disability." (A.R. 267-68.) Dr. Rock pointed out that Plaintiff's "gait was normal," and his "fine/gross motor manipulations were normal." (A.R. 268.) Dr. Rock concluded that Plaintiff's disability claim should be denied because his impairments were "non-severe." (A.R.

3

267-68.) On May 11, 2006, after Plaintiff requested that his disability denial be reconsidered, Dr. Vidya Madala ("Dr. Madala") reviewed Plaintiff's medical records at the request of DDD and affirmed Dr. Rock's assessment. (A.R. 322-23.)

Plaintiff returned to Heartland in October 2006 reporting problems with his left finger and knees, and was treated for Hepatitis C and tuberculosis. (A.R. 272-73.) On October 30, 2006, he complained of chest pains and was transported to Weiss Hospital, where he was treated by Dr. Amjad Sheikh ("Dr. Sheikh"). (A.R. 403-409, 423.) After a series of examinations,[5] Dr. Sheikh concluded that the overall function of Plaintiff's left ventricle was "mildly diminished," but there was "[n]o evidence of epicardial coronary artery disease" and there was "[n]ormal left ventricular diastolic pressure." (A.R. 408-409.) Dr. Sheikh opined that Plaintiff's chest pains were likely due to anxiety from having multiple significant stressors including his unemployment and homelessness. (A.R. 68, 360.)

On December 13, 2006, Plaintiff returned to Heartland and discussed his knee pain with a triage nurse. (A.R. 286.) Plaintiff was instructed to continue taking Ibuprofen as needed for the pain and to make a follow-up appointment. (*Id.*) In April and May 2007, Plaintiff went back to Heartland and was prescribed a cane to assist him with walking.[6] (A.R. 25, 272-86.)

---

[5] These examinations included a left heart catheterization, coronary arteriogram, left ventriculogram, femoral angiogram, echocardiogram and spectral and color flow doppler study. (A.R. 408, 410.)

[6] Plaintiff was also receiving treatment for Hepatitis C at Heartland during this time. (A.R. 472-86.)

4

## B. Evidence of Mental Impairment

On November 8, 2005, Plaintiff was given an intake assessment at the Community Counseling Centers of Chicago ("Community Counseling"). (A.R. 256.) In that assessment, Plaintiff claimed that his depression started when his wife died and that he had difficulty controlling his anger, which led him to get into fights. (A.R. 256-57.) Plaintiff also indicated that he had attempted suicide numerous times, most recently three weeks before the assessment. (A.R. 256-58.) The evaluator diagnosed Plaintiff with a "major depressive disorder" and indicated that his depression "seems to be directly related to the loss of his wife and the loss of his apartment." (A.R. 260-61.) A treatment plan was then created for Plaintiff, which included group therapy and psychiatric assessment. (A.R. 263-66.)

On April 24, 2006, Plaintiff completed a psychiatric evaluation by Dr. John O'Donnell ("Dr. O'Donnell"), at the request of the DDD. (A.R. 297.) During the evaluation, Plaintiff indicated that his depression started after his wife passed away. (A.R. 298.) He stated that he felt "down and sad" primarily "when he talks about his wife," but was getting better since he was now living in a shelter and going to therapy. (A.R. 300.) At the conclusion of the evaluation, Dr. O'Donnell diagnosed Plaintiff with a "major depressive disorder, without psychotic features" that was "in partial remission." (A.R. 303.) On May 8, 2006, Dr. Donald Cochran ("Dr. Cochran") reviewed Plaintiff's medical records at the request of the DDD and concurred with Dr. O'Donnell's assessment that Plaintiff suffered from depression. (A.R. 304-320.) In addition, Dr. Cochran determined that Plaintiff's depression failed to meet the criteria to establish a disability. (A.R. 307.) Dr. Cochran noted that Plaintiff's depression was secondary to his physical problems

5

and in partial remission. (A.R. 320.) He concluded that Plaintiff's capacity was "somewhat limited" but had he could "do simple work related tasks." (Id.)

From September 2006, through June 2007, Plaintiff participated in a depression research study group and received anti-depressant medication through the Uptown Research Institute ("Uptown"). (A.R. 427; R. 18, Pl.'s Mem. at 3.) During this period, Dr. John Sonnenberg ("Dr. Sonnenberg"), a psychologist with Uptown, reported seeing Plaintiff every two weeks concerning his depression. (A.R. 427.) Dr. Sonnenberg diagnosed Plaintiff with "major depression" and found that treatment had "modest effects;" even after treatment, Plaintiff was "still depressed." (A.R. 429.) Dr. Sonnenberg concluded that Plaintiff was "markedly depressed" and that his depression "compromises his ability to find and maintain work." (A.R. 430.)

## II. The ALJ Hearing

On September 22, 2005, Plaintiff applied for disability insurance benefits and supplemental security income. (A.R. 62.) Plaintiff's claims were denied initially on November 28, 2005, and upon reconsideration on June 14, 2006. (A.R. 74-78, 83-88.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (A.R. 89.) His hearing took place on July 3, 2007, before ALJ Cynthia Bretthauer in Evanston, Illinois. (A.R. 62.) Plaintiff was represented by non-attorney Danita Armant ("Armant"). (Id.) In addition, Ireczek, his case specialist at DHS, and Frank Mendrick ("Mendrick"), a vocational expert, attended the hearing. (Id.)

During the hearing, Plaintiff testified that he stopped working to take care of his wife. (A.R. at 21.) After his wife died, he lost his apartment and became homeless. (Id.) Plaintiff testified that he did not return to his previous job as a truck driver because he could not afford to

6

reacquire his trucking license. (A.R. 22.) When the ALJ asked why he didn't attempt to obtain other employment, Plaintiff testified that he doubted that he could physically handle working because he had "a bad hand," "bad finger" and could not "stand up too much." (A.R. 22-23.) Plaintiff, however, acknowledged that he "possibly" could have found work if the work could be done while he was sitting down. (A.R. 23.)

During the hearing, Plaintiff was using a cane when he walked. (A.R. 26.) The ALJ noted that when Dr. Joshi examined Plaintiff in October 2005, he was not using a cane and that Dr. Joshi indicated that Plaintiff seemed to walk fine. (*Id.*) Plaintiff explained that the cane had been prescribed to him about five months prior to the hearing by doctors at Heartland because his left knee "pops out of place from time to time." (A.R. 25.) Plaintiff explained that with the use of his cane he could stand for 45 minutes and walk about four blocks before needing to stop and take a rest. (A.R. 33.) Plaintiff testified that currently the pain in his left knee bothered him the most, but he also experienced pain in his right knee, left hand, and his back when he bended. (A.R. 30-31.)

Further, Plaintiff testified that his depression makes him "upset" and that he has problems sleeping. (A.R. 32.) Plaintiff testified that he had been receiving counseling from Community Counseling for about a year, but was no longer going because he had an outstanding bill and could not afford to pay for the services.[3] (A.R. 27.) Plaintiff also testified that he had participated in a depression research study group with Dr. Sonnenberg that ended about a week

---

[3] The ALJ noted that she had no medical records from Community Counseling other than the November 2005 intake assessment. (A.R. 27.) Armant indicated that she requested additional records but the assessment was the only record she had received. (*Id.*)

prior to the hearing.[4] (A.R. 28.) Plaintiff testified that he was still taking his daily dose of Seroquel, an anti-depressant prescribed by Dr. Sonnenberg, and stated that the medication helped "[q]uite a bit." (A.R. 30.)

The ALJ asked Plaintiff about his use of other drugs. (A.R. 33.) Plaintiff testified that he had used marijuana in the past, but that he had never done any "hard drugs." (A.R. 35.) The ALJ then pressed Plaintiff to explain his records which indicate he had done "extensive hard drugs" while in the military. (Id.) Plaintiff responded that he "used to drop acid and things like that," but that he did "not really" consider that hard drug use. (Id.)

Finally, Plaintiff described his typical daily routine. (Id.) He explained that he was now living in a single room occupancy ("SRO") building. (A.R. 17.) Plaintiff testified that he would either go to a local café that served meals to the homeless or cook his meals in his room. (A.R. 35.) Plaintiff indicated that he was able to clean his room himself, but that a friend comes to help him with his laundry. (A.R. 36.) Plaintiff also testified that he is able to bathe and dress himself when his back is not bothering him, but that once or twice a week he doesn't get up and get dressed "mostly because of the back pain." (A.R. 36-37.) Plaintiff further testified that he plays cards with the other residents and that he liked to read newspapers and books and goes to the library when he can. (A.R. 37.)

Next, Ireczek, Plaintiff's DHS case specialist testified. (A.R. 42.) Ireczek testified that she helped Plaintiff find shelter, public aid sources, and referred him to an agency to assist with

---

[4] Plaintiff testified that although the research group was finished, Dr. Sonnenberg knew about his financial situation and his outstanding Community Counseling bill, and planned to continue to counsel Plaintiff until he was able to make other arrangements. (A.R. 28.)

job placement. (A.R. 42-44.) Ircczek opined that she believed it would be difficult for Plaintiff to work because of his back pain and his "anger management problem." (A.R. 44.)

Finally, Mendrick, the vocational expert, testified at the hearing. (A.R. 45-49.) After reviewing Plaintiff's vocational history, Mendrick classified Plaintiff's previous jobs as semi-skilled and unskilled. (A.R. 46-47.) The ALJ then inquired if a person with the same vocational history as Plaintiff, who was limited to lifting 10-20 pounds, could only perform unskilled labor, and who could not engage with the general public, would be able to perform any of Plaintiff's previous jobs. (A.R. 48.) Mendrick testified that this hypothetical person could do the security, packing, machine and forklift operating jobs in Plaintiff's work history, but could not perform the truck driving jobs because these jobs required regular public contact. (*Id.*) Mendrick also testified that if this hypothetical person was limited to just sedentary work, that person could perform the security, packing, and machine operating jobs. (*Id.*)

## III. The ALJ Decision

On August 29, 2007, the ALJ concluded that Plaintiff was not disabled as of September 30, 2006, the date he was last insured, and therefore not entitled to disability insurance benefits. (A.R. 73.) However, the ALJ found that Plaintiff was disabled as of April 1, 2007, and entitled to supplemental security income. (*Id.*)

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since March 1, 2001, the alleged disability onset date, he did not have any severe impairment or combination of impairments from March 1, 2001, through September 28, 2005. (A.R. 64.) The ALJ determined that beginning September 28, 2005, Plaintiff had severe impairments, but that none of these impairments "resulted in the requisite functional limitations" to qualify as a

9

disability and that Plaintiff was still "capable of performing past relevant work." (A.R. 65, 71.) Specifically, the ALJ concluded that Plaintiff was "limited in that he could not lift and/or carry more than 20 pounds occasionally or more than 10 pounds frequently, and he was limited to simple, unskilled work without regular general public contact." (A.R. 65) Based on the testimony of vocational expert Mendrick, the ALJ found that Plaintiff could perform his previous jobs as a "security worker, packer, machine operator, and forklift operator." (A.R. 71.)

The ALJ noted that Plaintiff complained about knee pain as early as December 2006, and had developed a slight limp in his left leg by April 24, 2006, but continued to walk unassisted. (A.R. 67.) Plaintiff was using a cane, however, on April 30, 2007, the date of his musculoskeletal examination. (*Id.*) The ALJ concluded that Plaintiff's use of the cane illustrated "a change in his ability to perform work related activities" and therefore his disability began on April 1, 2007.[5] (*Id.*)

In addition, the ALJ concluded that Plaintiff's depressive condition was not an impairment that qualified as a disability and that although Plaintiff suffered from depression, he was capable of performing simple work-related job tasks. (A.R. 62, 71.) The ALJ acknowledged that Dr. Sonnenberg concluded that Plaintiff was "markedly depressed" and that his depression "compromises his ability to find and maintain work." (A.R. 430.) However, the ALJ disagreed with Dr. Sonnenberg's assessment stating:

> The [Plaintiff] testified before me the day after Dr. Sonnenberg made that statement. The [Plaintiff] testified to significant daily activities. He displayed evident intact concentration. Under oath he asserted wide and varied social contacts. Dr. Sonnenberg did not submit any progress notes to support his opinion, which is quite vague in the first place, and because of this, as well as

---

[5] The ALJ found the evidence could be "related back" one month to establish disability as of April 1, 2007. (A.R. 67.)

[Plaintiff's] testimony, little weight is given to his assessment.

(A.R. 70-71.) The ALJ also "rejected" the opinion of case manager Ireczek, who testified that Plaintiff could not work because of back and anger management problems. (A.R. 70.) The ALJ found that Ireczek's testimony was "not specific in terms of work related limitations." (*Id.*) Moreover, the ALJ noted that Ireczek was "not a mental health professional" and had "no qualifications to assess the extent of [Plaintiff's] back pain." (*Id.*)

Finally, the ALJ determined that Plaintiff was not a credible witness. Specifically, the ALJ found that "[n]ot seeking medical treatment for years while at the same time claiming to be disabled diminishes [Plaintiff's] veracity as a witness." (A.R. 68.) The ALJ also cited a number of inconsistencies in Plaintiff's testimony. (A.R. 68-69.) First, the ALJ noted that Plaintiff testified that he could only lift a maximum of five pounds, but then admitted that he probably could lift ten to twenty pounds. (A.R. 68.) In addition, the ALJ found that Plaintiff gave conflicting reasons as to why he stopped working. (A.R. 68-69.) Moreover, the ALJ noted that Plaintiff gave inconsistent statements about his past drug use. (A.R. 69.) The ALJ concluded that the inconsistencies about past drug use "also reduce the reliability of [Plaintiff's] statements as a whole." (*Id.*)

On August 5, 2008, the ALJ's decision became final when the Appeals Council denied Plaintiff's request for review.[6] (A.R. 1-3.) Thereafter, Plaintiff filed this action seeking judicial review by this Court. (R. 1, Compl.; R. 18, Pl.'s Mem. at 1.)

---

[6] Because the Appeal's Council denied Plaintiff's request for review, the ALJ's ruling constitutes the final decision of the Commissioner subject to judicial review. *Blakes v. Barnhart*, 331 F. 3d 565, 568 (7th Cir. 2003.)

11

## LEGAL STANDARDS

In reviewing the ALJ's decision, this Court determines whether the ALJ's factual determinations are supported by substantial evidence and based on proper legal criteria. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008). The ALJ must establish an "accurate and logical bridge" between the evidence and her conclusions. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). In reviewing the ALJ's conclusions, the Court "will 'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and 'the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.'" *Briscoe v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). However, it not the role of this Court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez,* 336 F.3d at 539.

## ANALYSIS

A claimant is qualified to receive Social Security disability benefits if he is found to be disabled within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E); *Briscoe,* 425 F.3d at 351. A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton,* 535 U.S. 212, 219-220 (2002).

12

To receive disability insurance benefits, a claimant must prove that he was disabled on or before the date his insured status expired. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

The Social Security Regulations ("SSRs") provide a five-step sequential evaluation to determine whether a claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520, 416.920. The ALJ must determine whether: 1) the claimant is performing substantial gainful activity; 2) the claimant has a severe impairment or impairments; 3) the claimant's impairment or combination of impairments meets or equals a listed impairment contained in the SSRs; 4) the claimant's impairments prevent him from doing his past relevant work; and 5) the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Briscoe*, 425 F.3d at 351-352. Affirmative answers to steps one, two, or four leads to the next step, while an affirmative answer at either step three or step five requires a finding of disability. *Id.* at 352. The claimant bears the burden for proving steps one through four, but at step five the burden shifts to the Commissioner. *Id.*

Plaintiff argues that the ALJ's step three finding is erroneous because the evidence of record establishes that he was disabled due to his depression as of December 2003. (R. 18, Pl.'s Mem. at 1.) Plaintiff further argues that the ALJ's finding that he was able to perform his past relevant work prior to April 1, 2007, was erroneous because Dr. Sonnenberg's report and other medical evidence of record establishes that Plaintiff could not work due to his "debilitating depression." (R.18, Pl.'s Mem. at 4; R. 27, Pl.'s Reply at 1.) Plaintiff argues that the ALJ improperly dismissed the testimony of Dr. Sonnenberg, improperly discredited Plaintiff's testimony, and that the ALJ's decision ignored medical evidence in the record. (*Id.*) In addition,

13

Plaintiff argues that the ALJ failed to consult a medical expert to determine his onset date as required by the Act. (*Id.*)

## A.     The ALJ's Discrediting of Dr. Sonnenberg's Testimony

In making her findings, the ALJ determined that Dr. Sonnenberg's assessment should be given "little weight." (A.R. 71.) Dr. Sonnenberg opined that Plaintiff was "markedly depressed" and that his depression "compromises his ability to find and maintain work." (A.R. 430.) Plaintiff claims that Dr. Sonnenberg was a "treating source" under the definition prescribed in the SSRs, and therefore his opinion was entitled to "controlling weight." (R.18, Pl.'s Mem. at 7.) Plaintiff argues that instead of giving Dr. Sonnenberg's opinion controlling weight, the ALJ "simply rejected it out of hand." (*Id.* at 8.)

A treating source is defined as "a physician, psychologist, or other acceptable medical source" that provides "medical treatment or evaluation" and has an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. In this case, Dr. Sonnenberg qualifies as a treating source; he had an ongoing relationship with Plaintiff that spanned over ten months. (A.R. 427.) During that period, Dr. Sonnenberg met with Plaintiff regularly and prescribed medication to help combat his depression. (A.R. 29-30.)

Typically, the opinion of a treating source on "the nature and severity of a medical condition is entitled to controlling weight if supported by medical findings and consistent with substantial evidence in the record." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004)); *see also* 20 C.F.R. § 404.1527(d)(2). However, the opinion of a treating source "is not the final word on a claimant's disability." *Schmidt,* 496 F.3d at 842 (internal quotations and citations omitted). The Seventh

Circuit has recognized that while a treating physician has the advantage over other physicians because he has spent more time with the claimant, many physicians will "bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006.) Therefore, "the weight properly given to testimony or other evidence of a treating physician depends on circumstances." *Id.* Accordingly, the ALJ may discount a treating physician's medical opinion if it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt,* 496 F.3d at 842.

Here, the ALJ gave several reasons for discrediting the assessment of Dr. Sonnenberg. First, the ALJ noted that Dr. Sonnenberg "did not submit any progress notes to support his opinion." (A.R. 71.) His "report," which purportedly covered over a ten-month period of treatment, was a four page form used to solicit medical information to determine if a patient is eligible for disability benefits, and was prepared the day before the hearing. (*See* A.R. 427-430.) In addition, the ALJ determined that Dr. Sonnenberg's conclusion was not consistent with the evidence in the record. (*Id.*) While Dr. Sonnenberg found that Plaintiff was "markedly depressed," consulting physicians Dr. Cochran and Dr. O'Donnell concluded that Plaintiff's depression was "in partial remission." (A.R. 303, 320.) Moreover, Dr. Sonnenberg's conclusion about Plaintiff's ability to find work was in contrast to the opinion of Dr. Cochran, who determined that although Plaintiff's capacity was "somewhat limited," he could "do simple work related tasks." (A.R. 320.) Finally, the ALJ found that Dr. Sonnenberg's assessment was not consistent with Plaintiff's testimony during the hearing. (A.R. 71.) The ALJ found that while testifying, Plaintiff "displayed evident intact concentration" and had testified to participating in

15

"significant daily activities" with "wide and varied social contacts." (A.R. 70-71.) The ALJ noted that during the hearing, Plaintiff testified that he regularly cooked, cleaned, played cards with friends, went to the library, and attended church services. (A.R. 36-37.)

This Court finds that substantial evidence supports the ALJ's decision to give "little weight" to Dr. Sonnenberg's assessment. The ALJ sufficiently articulated that Dr. Sonnenberg's report was discounted because it was inconsistent with the opinions of the consulting physicians. *See Schmidt,* 496 F.3d at 842. Moreover, Dr. Sonnenberg's report was not well-supported with objective evidence. *See Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008) (the assessment of a treating physician who provided "scant objective evidence" of a claimant's disability was not afforded controlling weight.) Therefore, the Court does not find remand necessary on this ground.

## B. The ALJ's Discrediting of Plaintiff's Testimony

Next, Plaintiff argues that the ALJ improperly determined that he was not a credible witness. (R.18, Pl.'s Mem. at 9.) "An ALJ is in the best position to determine the credibility of witnesses;" therefore, this Courts reviews that determination "deferentially," and will overturn a credibility determination "only if it is patently wrong." *Craft,* 539 F.3d at 678. The ALJ, however, "must articulate specific reasons for discounting a claimant's testimony as being less than credible." *Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir. 2005). The ALJ may not simply ignore testimony or rely solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility determination. *Id.* at 746-47.

"In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the

16

failure or infrequency of treatment." *Craft*, 539 F.3d at 679 (citing SSR 96-7p). The ALJ, however, "must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.* Here, the ALJ noted that Plaintiff claimed disability starting in March 2001, yet he did not seek any medical treatment until September 2005, four and a half years later. (A.R. at 68.) The ALJ found that, "[n]ot seeking medical treatment for years while at the same time claiming to be disabled diminishes the claimant's veracity as a witness." (*Id.*) Plaintiff argues that there is an "obvious explanation" as to why Plaintiff did not seek medical treatment during this time; he was homeless, disconnected from social services and had no ready access to medical care. (R. 18, Pl.'s Mem. at 10.)

An "inability to afford treatment" can provide insight to a claimant's lack of medical care. *Craft*, 539 F.3d at 679. In this case, the record clearly established that Plaintiff was homeless after his wife's death in December 2003, and was not able to afford treatment. (*See* A.R. 21, 257.) However, the ALJ never acknowledged Plaintiff's homelessness as a "good reason" for his lack of medical care. The ALJ therefore improperly discounted Plaintiff's testimony on this basis. *See Craft*, 539 F.3d at 679 ("[T]he ALJ must not draw inferences about a claimant's condition from [the] failure [to seek treatment] unless the ALJ has explored the claimant's explanations to the lack of medical care.").

However, the law is clear that where the ALJ has made errors reversal is not required if no reasonable trier of fact could have come to a different conclusion. *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000). In this case, Plaintiff was not homeless during a substantial period that he claimed to be disabled but provided no explanation for his lack of medical care during that

time. Moreover, it is clear that the ALJ did not rest her credibility assessment simply on Plaintiff's failure to seek treatment during his period of homelessness.

The ALJ also found that Plaintiff's level of treatment failed to suggest the limitations that he claimed. (A.R. at 69.) A claimant's statements may be less credible if the level of treatment is inconsistent with his level of complaint. SSR 96-7. In *Schmidt v. Astrue*, the Seventh Circuit did not disturb the ALJ's finding that plaintiff's allegations regarding her limitations were not fully credible because the record indicated that while alleging disabling pain, plaintiff discontinued therapy and had not pursued pain management options. *Schmidt*, 496 F.3d at 844. Here, Plaintiff complained of hand pain and received an x-ray, yet never followed up to learn the results or receive treatment. (A.R. at 24-25, 69.) Furthermore, despite his claims of disabling pain, Plaintiff was never prescribed any medication, other than Ibuprofen, for treatment. (A.R. at 69.)

Moreover, Plaintiff gave inconsistent testimony during the hearing. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. This includes reports and observations by other persons concerning the claimant's "daily activities, behavior, and efforts to work." *Id.* The ALJ noted that Plaintiff testified that he could lift a maximum of five pounds, but later admitted that he could probably lift ten to twenty pounds with his right hand. (A.R. 68.) In addition, the ALJ found that Plaintiff gave conflicting reasons as to why he stopped working. (*Id.*) He told Dr. O'Donnell that he lost his job as a truck driver because he could not pass a road test. (*Id.*) In his Community Counseling assessment and during the hearing, however, Plaintiff said that he resigned to care for his ailing wife. (*Id.*)

The ALJ also found that "inconsistencies about [Plaintiff]'s past drug use . . . reduce the reliability of his statements as a whole." (A.R. 69.) Plaintiff argues that this was "inappropriate" because these inconsistencies relate to events which occurred decades earlier "and have no relationship at all to the claims of disability." (R. 18, Pl.'s Mem. at 11.) However, inconsistent statements made to medical sources and the ALJ can be considered when evaluating the credibility of a claimant. *See* SSR 96-7p. The ALJ noted that in his Community Counseling assessment Plaintiff indicated that he had used numerous drugs, including marijuana, LSD, mushrooms, PCP and mescaline, and that he was dishonorably discharged from the military because of substance abuse. (A.R. 69.) Plaintiff, however, told Dr. O'Donnell that he was honorably discharged and denied any illicit drug use in the past, other than marijuana. (*Id.*, A.R. 300.) At the hearing, Plaintiff testified that he had used marijuana in the past, but that he had never done any "hard drugs." (A.R. 35.) However, when the ALJ told Plaintiff that his answer was inconsistent with the record, Plaintiff responded that he "used to drop acid and things like that," but that he did "not really" consider that hard drug use. (*Id.*)

In sum, the Court finds that the ALJ gave numerous "specific reasons" for discounting Plaintiff's testimony as being less than credible. *See Schmidt*, 395 F.3d at 746. Although it was improper for the ALJ to not consider Plaintiff's homelessness as the reason he had not sought medical treatment, her credibility determination did not rest on this basis alone, and thus does not permit remand. *See Sanchez v. Barnhart*, 467 F.3d 1081. 1082-83 (7th Cir. 2006) (harmless errors do not permit a reviewing court to upset the agency's decision); *see also Hoffman v. Barnhart*, No. 02 C 8187, 2005 U.S. Dist. LEXIS 571, *48 (N.D. Ill. Jan. 12, 2005) (declining to disturb the ALJ's credibility finding where an improper basis was merely an additional factor in

the ALJ's assessment.) Accordingly, this Court finds that the ALJ's credibility determination was not "patently wrong," and will not overturn it.

## C. The ALJ's Reliance on Medical Evidence in the Record

Next, Plaintiff argues that the ALJ's findings were not adequately supported and that she ignored medical evidence in the record. (R.18, Pl.'s Mem. at 5.) It is Plaintiff's burden to prove that he was disabled on or before the date his insured status expired. *See Stevenson*, 105 F.3d at 1154. Plaintiff claims that the medical evidence of record establishes that he "suffered from debilitating depression triggered by his wife's death." (R.. 27, Pl.'s Reply at 1.) To meet his burden, Plaintiff heavily relies on the assessment of Dr. Sonnenberg and his own statements that he was "unable to function at all three days of the week and functioned below par on the other four days." (*See* R. 18, Pl.'s Mem. at 5.) However, as previously discussed, the ALJ properly gave Dr. Sonnenberg's conclusion "little weight" and discounted Plaintiff's statements because he was not a credible witness. The ALJ concluded that the record established that Plaintiff's depression was not disabling and did not prevent him from performing previous work activities. (A.R. 62, 65.)

An ALJ "need not provide a written evaluation of every piece of evidence that is presented," when making her determination; rather she must adequately articulate the justification for her decision. *Scheck*, 357 F.3d at 700. In this case, the ALJ relied on the medical evidence in the record to conclude Plaintiff's depression was not disabling, including Dr. O'Donnell's April 24, 2006, assessment that Plaintiff's depression was "in partial remission." (A.R. 68.) Dr. O'Donnell found that Plaintiff's depressive symptoms had "improved," and that he was "fully oriented," "friendly, cooperative, and pleasant." (*Id.*) Dr. O'Donnell also found

20

that Plaintiff's depression was "secondary" to his physical complaints and that he had no difficulty expressing abstract thoughts, identifying similarities and differences, or articulating judgment and insight. (A.R. 302-303.)

The ALJ also noted that Plaintiff "has never had an episode of decompensation, of extended duration" or "has never been psychiatrically hospitalized." (A.R. 70.) Further, the ALJ found that even though Plaintiff testified that his therapy and medication were "helpful," after the research group was completed, Plaintiff had not sought mental health treatment elsewhere.[7] (A.R. 69-70.) In making her assessment, the Court finds that the ALJ established an "accurate and logical bridge" between the evidence and her conclusion that Plaintiff's depression was not disabling. *See Craft v. Astrue,* 539 F.3d at 673.

In addition, the ALJ's determination that Plaintiff could perform unskilled work activities is also supported by substantial evidence in the record. On May 8, 2006, Dr. Cochran reviewed Plaintiff's medical records and found that despite his depression, Plaintiff had the capacity to perform simple work related tasks. (A.R. 304-320.) Moreover, vocational expert Mendrick testified that based on his residual functional capacity[8] a hypothetical person similarly situated to Plaintiff would be able to perform several unskilled, non-driving jobs identified in Plaintiff's work history. (A.R. 48.) Mendrick further testified that if this hypothetical person was limited to just sedentary work, that person could perform Plaintiff's previous security, packing, or machine operating jobs. (*Id.*)

---

[7] The ALJ noted that Plaintiff said he "thought about going to Stroger Mental Health to receive free or low cost services," but has yet to seek such treatment. (A.R. 69.)

[8] "Residual functional capacity is that which a claimant can do despite her physical and mental limitations." *Clifford v. Apfel,* 227 F.3d 863, 873 n.7 (7th Cir. 2000).

Plaintiff claims that Mendrick's testimony was "self-contradictory" and does not support the ALJ's finding that Plaintiff could perform past relevant work prior to April 1, 2007. (R. 18, Pl.'s Mem. at 6-7.) Plaintiff argues that although several of the jobs in his work history were semi-skilled, the ALJ's hypothetical inquired whether a person limited to unskilled jobs could perform jobs in Plaintiff's work history. (*Id.* at 6.) Plaintiff argues that Mendrick's response failed to consider that several of Plaintiff's jobs were semi-skilled, and therefore cannot form a basis for the ALJ's ultimate finding that Plaintiff could perform his past relevant work. (*Id.*) This Court does not agree. "If a [claimant] can engage in past relevant work, he is not disabled." *Craft*, 539 F.3d at 674. Mendrick clearly indicated that Plaintiff was capable of performing his previous unskilled jobs, therefore the ALJ was justified to conclude that Plaintiff was not disabled because he could perform his past relevant work.

### D.    The ALJ's Decision Not to Consult a Medical Expert

Finally, Plaintiff argues that the ALJ did not support her findings "as to the severity of [Plaintiff's] depression" with the testimony of a medical expert as required by SSR 83-20. (R. 18, Pl.'s Mem. at 4; R. 27, Pl.s Reply at 3.) SSR 83-20 addresses situations in which an ALJ finds that a person is disabled as of the date of the disability application, but it is still necessary to ascertain whether the disability began before the date of last insured. SSR 83-20 ; *Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008.) As previously discussed, the ALJ properly determined that Plaintiff's depression was not disabling. (*See* A.R. 65.) Therefore, there was no need for a medical expert to determine when Plaintiff's depression began. *Eichstadt*, 534 F.3d at 667 ("With no finding of disability, there was no need to determine an onset date."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (the ALJ is not required to call a medical expert

when the evidence adequately establishes that plaintiff is not disabled.).[9] Accordingly, this Court

declines to remand on this basis.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for summary judgment (R. 22)

is GRANTED, and Plaintiff's motion for summary judgment (R. 16) is DENIED. The Clerk of

this Court is directed to enter judgment in favor of the Commissioner.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated: August 17, 2009**

---

[9] Even if SR 83-20 did apply to this situation, the Seventh Circuit has held that the regulation does not require an ALJ to consult a medical expert; "the ultimate decision is up to the ALJ." *Eichstadt*, 534 at 667; *see also Flener v. Barnhart*, 361 F.3d 442, 448-449 (7th Cir. 2004) ("[T]he ALJ's reasoned judgment of how much evidence to gather should generally be respected.").

23